IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| CENTRAL WEBER SEWER IMPROVEMENT DISTRICT,<br><br>      Plaintiff,<br><br><br><br>      vs.<br><br><br><br>ACE FIRE UNDERWRITERS INSURANCE COMPANY,<br><br>      Defendant. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br><br><br><br>Case No. 1:12-CV-166 TS |

This matter is before the Court on Defendant ACE Fire Underwriters Insurance Company's Motion for Summary Judgment.[1] Also before the Court is Plaintiff Central Weber Sewer Improvement District's Motion for Leave to File Surreply in Opposition to Defendant's Motion for Summary Judgment.[2] For the reasons discussed more fully below, the Court will grant Plaintiff's Motion for Leave to File Surreply and grant in part and deny in part Defendant's Motion for Summary Judgment.

---

[1]Docket No. 27.

[2]Docket No. 45.

## I.  BACKGROUND

Plaintiff is a public entity and a political subdivision of the State of Utah.  Defendant is an insurance company incorporated in Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  At issue in this dispute is whether Plaintiff should be allowed to recover under a builders risk insurance policy—Builders Risk Policy No. 121018880 001 (the "Policy")—issued by Defendant to Plaintiff.

Plaintiff owns and operates a sewer treatment plant in Weber County, Utah.  In 2008, Plaintiff commenced a $138 million expansion and modernization project at its sewer treatment plant.  Plaintiff took out the Policy with Defendant to cover the project.   The Policy is an all-risk policy and covers Plaintiff's waste water treatment plant expansion for losses up to $100 million.[3]  The insureds on the Policy include Plaintiff, "their Contractors, Sub-contractors, and Sub-sub contractors."[4]

Plaintiff hired MWH Constructors ("MWH") to manage the construction of the project. The project included the construction of a new headworks facility.  The headworks of a wastewater treatment plant is the initial stage of a complex process to reduce the level of pollutants in the incoming domestic and industrial wastewater to a level that will allow the treated wastewater or effluent to be discharged into a stream, river, or lake.  The function of the headworks is to remove inorganics such as sticks, stones, grit, and sand from the wastewater stream to protect and reduce wear on the downstream process equipment.

---

[3] *See* Docket No. 27 Ex. 1, at 4.

[4] *Id.* at 7.

The construction of the headworks involved the excavation of an area approximately 100 feet by 160 feet to a depth of 36 feet.  The excavation was required to construct the concrete slab foundation and lower areas of the headworks.  The headworks excavation was a shored excavation that employed a temporary metal sheet pile to restrain the walls of the excavation until the excavation was backfilled.

The sheet pile shoring system used at the headworks excavation was designed by Geotechnical Design Systems, Inc. ("GDSI").  The shoring design used 26-foot-high sheet piles embedded approximately 8 feet below the anticipated bottom of the excavation.  Three rows of tie back anchors were then attached to the sheet piles and installed at an angle of approximately 15 degrees from horizontal.  The tie back anchors consisted of 48-foot cables that were buried in the ground outside of the excavation to secure the sheet piles.

It was known at the outset of the project that the site of the headworks excavation contained groundwater that would need to be removed.  Indeed, during the early stages of construction, a pipe was found inserted in the ground near the northwest corner of the excavation for the purpose of extracting percolating groundwater for irrigation.  GDSI's shoring design called for a number of dewatering wells to be used to remove excess groundwater from the site. The design also called for a slurry wall to be constructed outside of the excavation to prevent additional groundwater from flowing into the dewatered excavation.  The dewatering wells were placed within the base of the excavation itself and between the excavation and the slurry wall.

In early February 2009, the sheet pile on the north side of the excavation dropped approximately five inches and then slid approximately six feet toward the center of the

excavation.  During the slide, the north section of the sheet-pile wall became twisted.

Additionally, the movement of the sheet piles damaged a dewatering well, electrical equipment,

and a gravity discharge line.

Plaintiff took steps to remediate the slide.  Plaintiff installed a number of additional

dewatering wells within the excavation, between the excavation and the slurry wall, and beyond

the slurry wall.  Plaintiff also repaired the equipment damaged during the slide and replaced the

damaged section of the sheet-pile wall itself.  As part of the rehabilitation of the slide, Plaintiff

removed the ground surface in the area of the displaced sheet wall and replaced the excavated

area with a synthetic geogrid and a zone of cobble.  Plaintiff then began the process of pouring

the foundation for the headworks facility.

The foundation for the headworks facility was designed to be constructed in a

checkerboard of large concrete squares.  Early in the process of pouring the concrete squares,

MWH and its subcontractors discovered that the squares that had been poured—located in the

northern section of the excavation—shifted excessively.  Because this excessive shifting of the

foundation squares would prevent the foundation from functioning as intended, Plaintiff decided

to pour the foundation as a single slab.

Prior to pouring the foundation slab, a void formed in the floor on the west side of the

excavation.  The void formed directly north of where a trench for a 60-inch-diameter pipe

intersected the main excavation.  Plaintiff remedied the void issue by injecting grout into the void

after the slab was placed.  A second void later developed near this same location.  The second

void was also remedied through compaction grouting.

4

Of note, prior to the formation of the voids, a well sprang up in this same area, feeding a sufficient amount of water into the excavated area to fill the entire excavation in a single night. This well was later capped, at which point water once more began flowing from the ground outside of the excavation near the location where the irrigation pipe was found at the outset of the project.

Based on the foregoing events, Plaintiff made three loss claims against the Policy. The first was for the failure of the sheet-pile wall. Plaintiff notified Defendant of this loss on February 24, 2009. The second was for the movement or settling of portions of the concrete foundation. Plaintiff notified Defendant of this claim on August 29, 2009. The third was for the appearance of voids in and around the excavation. Plaintiff notified Defendant of the formation of the voids on August 29, 2009, and February 3, 2010.

Immediately following the failure of the sheet-pile wall, MWH and its subcontractors investigated the cause of the failure. GDSI concluded that the slide "can be attributed to changed or unknown site conditions, in the form of subsurface flow."[5] GDSI further indicated that "[i]t is apparent that there is subsurface inflow from the north" and "[t]he flowing groundwater has been observed as being silty at different locations and times, meaning that subsurface erosion has been underway."[6] According to GDSI, the "factor of safety for the shoring system is greater than 1.0" and such a factor of safety "implies that an additional factor was present to provide a trigger to

---

[5]Docket No. 30 Ex. 1 app. B, at 1.

[6]*Id.*

initiate the slide."[7]  GDSI was of the opinion that the slide occurred because of internal erosion or piping that resulted from the unforseen subsurface flow.

On March 6, 2009, Defendant retained Crawford Global Technical Services ("Crawford") as its adjuster for the sheet pile claim.  Shortly thereafter, Crawford sent a reservation of rights letter to Plaintiff and MWH stating that Defendant and the insured's rights were reserved under the Policy.  The letter specifically cited an exclusion found in section B.3. of the Policy that excludes coverage for loss resulting from "[f]aulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction" and "[m]aterials used in repair, construction, renovation, or remodeling."[8]

Crawford instigated an investigation into the cause of the sheet pile failure.  Crawford retained Intermountain GeoEnvironmental Services, Inc. ("IGES"), a geotechnical expert, to assist in evaluating the cause of the sheet pile failure.  As early as March 19, 2009, Crawford indicated that the losses might be the result of a design defect.  Crawford communicated to Defendant at that time that "it looks like a probable design error in the shoring system."[9]

Crawford also investigated the losses claimed by Plaintiff.  As part of its investigation, Crawford requested documentation to support Plaintiff's alleged losses.  Plaintiff complied by providing extensive documentation to support its claims.  Crawford retained a consultant to review the documentation provided and determine what costs were properly supported.

---

[7]*Id.*

[8]Docket No. 27 Ex. 3 app. B, at 3.

[9]*Id.* Ex. 2, at 1.

In its reports, Crawford included calculations of supported losses to date.  However, Crawford also made clear that the loss calculations were performed merely for purposes of identifying losses supported by documentation and did not include a coverage analysis.[10] Crawford indicated that "the claim was being investigated and evaluated under a Reservation of Rights."[11]  According to Crawford, Plaintiff "was reminded in all meetings that there is a possibility the claim may not be covered due to the policy exclusion for faulty design."[12]

Plaintiff's second two claims against the policy were initially assigned to other claims adjusters; however, responsibility for both of those claims was transferred to Crawford in December 2009.  Crawford similarly retained IGES to investigate the cause of the slab settlement and void losses.

On June 18, 2009, IGES provided Defendant with its professional opinion as to the cause of the sheet pile failure.  In a letter addressed to Crawford, IGES indicated that

> the design prepared by GDSI for support of the headworks shoring unconservatively estimated the design earthpressures and anchor loads required to achieve moment equilibrium considering the limited toe embedment specified. Likewise, the effectiveness of the dewatering assumed was incorrect, adding additional pressure applied to active forces on the shoring.  The result of these unconservative assumptions and approximations was the resulting global stability failure of the shoring along the north side of the excavation.[13]

---

[10] *See* Docket No. 30 Ex. 18.

[11] *Id.* at 883.

[12] *Id.*

[13] Docket No. 27 Ex. 3 app. G, at 2.

7

On December 24, 2009, IGES provided Defendant a report analyzing Plaintiff's slab settlement claim.  In that report, IGES stated that "the movements observed during the initial segment mat construction at the base of the headworks basin were within the range that could have been anticipated, considering the geotechnical conditions at the site and the construction sequence executed for the work."[14]  In a report provided to Defendant on April 28, 2010, IGES opined that the voids that formed in the excavation were most likely related to the dewatering activities in the nearby pipe trench.[15]

Defendant sent a letter to Plaintiff explaining its coverage position as to the three claims on May 3, 2010.  With regard to the sheet pile failure, Defendant took the position that the Policy's faulty, inadequate, or defective design exclusion precluded coverage for the sheet pile failure.  Nevertheless, Defendant conceded that the resulting loss provision allowed coverage for losses caused by impact or debris from the sheet pile failure.  Defendant also explained that it would not pay for soft costs because there had been no delay in the completion date for the project and that several other costs were precluded because they were not a direct physical loss.

In the May 2010 letter, Defendant declined to cover the slab settlement claim because there had been no direct physical loss to the concrete foundation.  Defendant also denied coverage as to the voids, based on its position that the voids were not accidental loss or damage under the Policy's terms because they were expected pursuant to the terms of the construction contract.

---

[14]*Id.* app. H, at 2.

[15]*Id.* app. I, at 17–18.

Plaintiff disputed Defendant's coverage position.  Thus, Defendant proposed that the parties engage in a third-party peer review process.  The process involved retaining an independent expert geotechnical engineer to review the reports prepared by GDSI and IGES to determine the cause of the sheer pile wall failure, the settlement of the slab, and the formation of the voids.  Plaintiff accepted Defendant's proposal.  Defendant then identified two expert geotechnical engineers the parties could potentially contract to review Plaintiff's claims. Plaintiff allowed Defendant to select the expert it desired from the two identified.

On February 22, 2011, Defendant retained Avram Ninyo of Ninyo & Moore to perform the peer review.  Mr. Ninyo issued a report on June 6, 2011, that reached the following conclusions.  First, the failure of the sheet-pile wall "occurred as a result of inadequate design of the sheet pile shoring system to accommodate the underlying geologic and groundwater conditions underlying the site."[16]  According to Mr. Ninyo, the "result of [Ninyo & Moore's] global stability analysis for the pre-failure (as-built) condition indicated a factor-of-safety significantly less than 1.0."[17]

Second, the slab settlement

was mainly caused by groundwater flow below the base of the excavation resulting in migration of fine soil particles from the underlying clay . . . into the voids in the overlying cobble zone.  The movement of the soil particles into the void space of the cobble zone manifested as settlement of the concrete slabs.[18]

---

[16]*Id.* app. P, at 11.

[17]*Id.*

[18]*Id.* at 15.

Third, the voids were "mainly caused by groundwater flow below the bottom of the excavation causing movement of fine soil particles toward the open-cut excavation for the 60-inch diameter pipe."[19]  "Removal of groundwater from within the trench as part of the dewatering operations also contributed to the formation of the voids by inducing groundwater flow toward the excavation."[20]

After the release of Mr. Ninyo's report, both parties were given an opportunity to address any further questions to Mr. Ninyo.  One question asked by Defendant was whether "any of the design and/or specifications f[e]ll below the standard of care in causing the voids within the excavation subgrade."[21]  Mr. Ninyo's response was that

> [t]he redesign of an adequate shoring system to accommodate the site conditions (if it had been performed) would have resulted in a toe embedment depth of the sheet pile wall greater than the 8 feet specified in the original design.  A deeper toe embedment would have reduced groundwater flow below the excavation, thereby, reducing the potential for the formation of voids in the excavation subgrade.[22]

Defendant issued its final coverage determination on April 11, 2012.  Defendant sent a letter to Plaintiff stating that

> [b]ased on the evaluation and opinions of Ninyo & Moore, it is reasonable . . . to conclude that the three manifestations of damage, i.e., the sheet pile failure, the voids and the slab settlement are one occurrence under the definition quoted

---

[19]*Id.* at 16.

[20]*Id.*

[21]*Id.* app. S, at 4.

[22]*Id.*

above as each is attributable, directly or indirectly, to the inadequate design of the sheet pile shoring system.[23]

Defendant's letter also responded to several of Plaintiff's claims individually based on Defendant's analysis of the Policy.  Defendant indicated that (1) there was no coverage for costs that did not constitute direct physical loss or damage, including costs to redesign and install a monolithic foundation, to replace material under the foundation, to reinforce other sections of the sheet-pile wall, and to add additional watering wells; (2) there was no coverage for soft costs because the project was not sufficiently delayed; (3) there was no coverage under the Flood Endorsement; and (4) there was no coverage under the Earth Movement Endorsement because the proximate cause of the earth movement was the faulty design of the sheet pile shoring system.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence

---

[23]Docket No. 39, at 32 (internal quotation marks and citation omitted).

[24]Fed. R. Civ. P. 56(a).

presented.[25]  The Court is required to construe all facts and reasonable inferences in the light

most favorable to the nonmoving party.[26]

### III.  DISCUSSION

Defendant moves for summary judgment on Plaintiff's claims for breach of contract and

breach of the implied duty of good faith.  In the course of briefing Defendant's Motion, the

parties raised numerous evidentiary objections.  At the outset, the Court will address Plaintiff's

Motion for Leave to File Surreply and the parties' evidentiary objections.  The Court will then

address the parties' summary judgment arguments as to each of Plaintiff's claims in turn.

### A.    SURREPLY

Plaintiff seeks leave to file a surreply.  Plaintiff asserts that a surreply is warranted in this

instance because Defendant raised new arguments and presented new evidence in its Reply.

Defendant contends that Plaintiff's Surreply amounts to no more than an untimely evidentiary

objection and must be denied.

As Defendant correctly notes, the majority of Plaintiff's Surreply is dedicated to

responding to evidentiary objections and new evidence included in Defendant's Reply.  The only

legal argument in Plaintiff's Surreply simply restates legal argument already raised by Plaintiff in

its Response.  Pursuant to DUCivR 7-1(b)(1)(B), "[i]f new evidence is proffered in support of a

reply, any evidentiary objection must be filed within seven (7) days after service of the reply."

---

[25]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[26]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

Similarly, a memorandum responding to an evidentiary objection raised for the first time in a reply memorandum must be filed "no later than seven (7) days after the objection is filed."[27]

Defendant's Reply memorandum was filed on October 22, 2013.  Plaintiff filed its Motion for Leave to File Surreply on November 21, 2013.  Thus, under a plain reading of the local rules, Plaintiff's Surreply is untimely.  The issue before the Court is whether Plaintiff's untimeliness merits denial of its Motion.

In this instance, a denial of Plaintiff's Motion will result in Plaintiff not being allowed to respond to Defendant's evidentiary objections and may result in the exclusion of Plaintiff's only expert testimony.  Such an exclusion could in turn result in the grant of summary judgment in Defendant's favor.  Thus, a denial of Plaintiff's Motion may result in judgment being entered against Plaintiff.

"A district court undoubtedly has discretion to sanction a party for . . . failing to comply with local or federal procedural rules."[28]  However, a sanction that results in a "final disposition of a party's claim 'is a severe sanction reserved for the extreme case, and is only appropriate where a lesser sanction would not serve the ends of justice.'"[29]  In the context of granting dismissal or summary judgment as a sanction, this Court must consider: "(1) the degree of actual prejudice to the opposing party; (2) the amount of interference with the judicial process; and (3) the culpability of the litigant.  'Only when these aggravating factors outweigh the judicial

---

[27]DUCivR 7-1(b)(1)(B).

[28]*Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

[29]*Id.* (quoting *Hancock v. City of Okla. City*, 857 F.2d 1394, 1396 (10th Cir. 1988)).

system's strong predisposition to resolve cases on their merits is outright dismissal with prejudice an appropriate sanction.'"[30]  Given the potentially determinative nature of Plaintiff's Motion, the Court finds the afore-listed factors aide its determination of the proper sanction to be applied in this case.

Plaintiff filed its Surreply three weeks after the time allotted under the local rules.  During the intervening three weeks, no filing or other deadlines expired.  Indeed, in the interim the parties filed a joint motion for scheduling order setting a new trial date for February 23, 2015.  In light of the stage of this case, Plaintiff's late filing will cause very little interference with the judicial process and is unlikely to result in any undue prejudice to the Defendant.  Further, the evidence included in Plaintiff's Surreply is central to Plaintiff's claims and its inclusion should not come as any great surprise to Defendant.  Finally, while Plaintiff is certainly culpable for its untimely filing, the length and complexity of Defendant's Reply somewhat palliates Plaintiff's tardiness.

In sum, Plaintiff's failure to file its Surreply in a timely fashion results in very little interference in the judicial process or prejudice to Defendant and these factors do not outweigh the judicial system's strong predisposition to resolve this case on the merits.  For this reason, the Court will grant Plaintiff's Motion.  Plaintiff, however, is cautioned that strict compliance with the local rules is expected and any future violation of the local rules could result in sanctions.

---

[30]*Id.* (quoting *Hancock*, 857 F.2d at 1396).

B.    EVIDENTIARY DISPUTES

Both parties object to the Court's consideration of the opposing party's expert reports. Plaintiff objects to the Court's consideration of the expert reports provided by IGES and Mr. Ninyo on the basis that the reports are unsworn statements and inadmissible hearsay.  Defendant objects to the Court's consideration of Plaintiff's expert reports on the basis that they are "not properly authenticated, hearsay, and inadmissible under Federal Rule of Evidence 702."[31] Defendant also takes issue with Mr. Lance Wood's affidavit to the extent he seeks to opine as an expert.

1.    EXPERT REPORTS

Federal Rule of Civil Procedure 56(c)(1) instructs that a party may support its factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials."  Rule 56(c)(2) allows a party to object to the consideration of material on summary judgment that "cannot be presented in a form that would be admissible in evidence."  The Tenth Circuit has clarified that "evidence need not be submitted 'in a form that would be admissible at trial.'"[32]   Rather, "the content or substance of the evidence must be admissible."[33]

_____

[31]Docket No. 39, at 38.

[32]*Argo v. Blue Cross & Blue Shield, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

[33]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 2005)).

Here, the parties each argue that the opposing party's expert reports are inadmissible hearsay.  "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[34]  The reports at issue do contain out of court statements and, at the very least, portions of the report are offered to prove the truth of the matter asserted.  Thus, the reports do contain, at least in part, hearsay statements.

That being said, the opinions set out in the expert reports "may ultimately be presented at trial in an admissible form."[35]  For example, the parties may call the experts to testify as to the opinions rendered in the report.  Such statements would be made in court and would not qualify as hearsay statements.  Further, under Rule 703 an expert may rely on otherwise inadmissible evidence and still have their opinion admitted.[36]  Because the expert reports represent evidence that would be admissible at trial, the Court rejects the parties' argument that the expert reports are inadmissible hearsay.

The parties also argue that the expert reports are inadmissible because they are not properly authenticated.  The parties seek to authenticate their reports by attaching them as exhibits to declarations submitted by representatives of their respective entities.  Defendant submitted its expert reports as an exhibit to Ms. Linda Parham's declaration.  Ms. Parham is a

---

[34]Fed. R. Evid. 801(c).

[35]*Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006).

[36]*See* Fed. R. Evid. 703.

senior claim director for Defendant and was the claims director during at least part of Plaintiff's

claim process.  Plaintiff submitted its expert report as an exhibit to Mr. Wood's declaration.

"To satisfy the requirement of authenticating or identifying an item of evidence, the

proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is."[37]  An authenticating affidavit is not required for an exhibit to be

admissible at summary judgment.[38]  "Rather, documents produced during discovery that are on

the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rule

of Evidence 901."[39]  Further, an exhibit may "be sufficiently authenticated taking into

consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive

characteristics, taken in conjunction with circumstances.'"[40]

In the instant case, the expert reports at issue were the focus of discovery.  Defendant's

expert reports were disclosed in the parties' initial disclosures and those reports directly address

the GDSI reports.  The parties also provided declarations that attest to the authenticity of the

reports and, while the declarations are not from the authors of the reports, they are from

individuals who received the reports as they were prepared.  Though not necessary for

---

[37]Fed. R. Evid. 901(a).

[38]*See Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986).

[39]*Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (citing *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1101 (10th Cir. 2005), *overruled on other grounds as recognized in Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991)).

[40]*Id.* (citing Fed. R. Evid. 901(b)(4)).

authentication, the parties have also provided supplemental declarations from the authors of the expert reports in an effort to resolve any evidentiary objections.  Further, the Court has reviewed each of the reports individually and finds that the reports bear the appearance, content, substance, and internal patterns that, taken in conjunction with the circumstances of this case provided above, establish their authenticity.  In light of the foregoing, the Court finds that the expert reports are properly authenticated.

Defendant also argues that Plaintiff's expert reports are inadmissible under Federal Rule of Evidence 702.  Defendant makes the same objection to GDSI's and Gerhart Cole, Inc.'s reports.  Defendant's objection is that "there is no indication that the people performing the analysis [in Plaintiff's reports] were properly qualified or that the methodologies being employed were reliable."[41]

"Consistent with the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 requires trial courts to act as gatekeepers, admitting only expert testimony that is both reliable and relevant."[42]  Pursuant to Rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if," among other things, the expert's "testimony is the product of reliable principles and methods" and "the expert has reliably applied the principles and methods to the facts of the case."[43]

---

[41]Docket No. 39, at 37.

[42]*Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1086 (10th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

[43]Fed. R. Evid. 702.

Here, Plaintiff has provided as an exhibit to its Surreply a declaration from Mr. Jerold Bishop, the engineer that investigated the cause of the sheet pile failure on behalf of GDSI. Attached to the declaration is Mr. Bishop's curriculum vitae.  It is apparent from the curriculum vitae that Mr. Bishop is qualified to testify as an expert.  Plaintiff, however, has not provided any information as to the qualifications of Gerhart Cole.  Without this information the Court is unable to determine whether Gerhart Cole is qualified to provide its report.  For that reason, the Court will not rely on the opinions of Gerhart Cole in its consideration of Defendant's Motion.

As to methodologies, Defendant has not identified which of the methodologies employed by GDSI it believes to be unreliable.  In its March 16, 2009 report, GDSI indicated that it "performed several stability studies of the existing slide mass."[44]  In performing its stability studies, GDSI utilized a cross-sectional model.  The "model was based upon the stratigraphy presented in the boring drilled for this study and uses the soil strengths for each layer previously noted and the undrained strength models outlined above for the foundation."[45]  GDSI also used GeoStudio (SlopeW) 2007, Version 7.13 software and employed the following established methods: Morgenstern-Price, Modified Bishops, Ordinary Method, and Janbu Methods.[46]  GDSI concludes its report by stating that its "work has been completed in general accordance with standard engineering practice of the day."[47]

---

[44]Docket No. 45 Ex 1 app. C, at 9.

[45]*Id.*

[46]*Id.* at 10.

[47]*Id.* at 20.

Based on the foregoing, the Court is persuaded that GDSI applied reliable methodologies. Further, at this juncture it appears that GDSI has reliably applied the principles and methods to the facts of the case.  GDSI's opinions are also relevant to the issues before the Court on Defendant's Motion.  For all of these reasons, the Court finds that GDSI's reports are admissible under Rule 702.

As an ancillary matter, the Court notes that Defendant asserts that the timing of GDSI's reports render them unreliable and irrelevant for purposes of Rule 702.  Defendant argues that

> each of [GDSI's] reports was made prior to the reports prepared by IGES and Ninyo & Moore and no further reports from GDSI have been provided either prior to or during this litigation.  The issues presented by GDSI in its reports were addressed by the analyses and conclusions of both Mr. Wallace and Mr. Moore and [Plaintiff] has provided no evidence to the contrary.[48]

While the timing of GDSI's reports relative to the timing of Defendant's reports certainly lends itself to an attack on the credibility of GDSI's opinions, the timing issue alone does not render GDSI's opinions inadmissible.  The United States Supreme Court has instructed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[49]  While Defendant is free to attack the relative weight of GDSI's reports, it cannot simply discount the reports as unreliable and irrelevant on this grounds.

---

[48]Docket No. 39, at 38.

[49]*Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

2.      WOOD DECLARATION

Defendant objects to the Court's consideration of the declaration provided by Mr. Wood. According to Defendant, the Court should disregard the majority of Mr. Wood's declaration because Plaintiff has not provided "any evidence that [Mr. Wood] is an engineer or otherwise has any expertise that would qualify him to opine regarding the technical aspects of the headworks excavation."[50]  Plaintiff contends that Defendant "previously acknowledged that Mr. Wood is a professional engineer."[51]

Pursuant to Federal Rule of Civil Procedure 701, a lay witness may testify as to those opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

In the declaration at issue, Mr. Wood briefly discusses Plaintiff's expansion project and describes the construction of the headworks in general terms.  Mr. Wood also describes the work performed by GDSI and MWH, the failure of the sheet-pile wall, and the subsequent reports prepared by GDSI.  Mr. Wood's declaration concludes with a discussion of the claims handling process.

Mr. Wood's declaration is not technical in nature and is not based on scientific or other specialized knowledge that would fall under the purview of Rule 702.  Further, it is undisputed that Mr. Wood is Plaintiff's General Manager.  As Plaintiff's General Manager, Mr. Wood is

---

[50]Docket No. 39, at 36.

[51]Docket No. 45, at 2.

qualified under Rule 701 to opine on those issues that are rationally based on his perception.  It stands to reason that Plaintiff's General Manager would be familiar with the details of a $138 million expansion project taking place at Plaintiff's sewer treatment facility.  Indeed, at the outset of his declaration Mr. Wood attests that he has "personal knowledge of the matters set forth herein."[52]

The Court reads Mr. Wood's declaration as being his understanding of what occurred at the site and attesting to the documentation he received during the course of the project. Accordingly, the Court will overrule Defendant's objection to Mr. Wood's declaration.

C.      BREACH OF CONTRACT

This matter arises under the Court's diversity jurisdiction, therefore the Court will apply the substantive law of the State of Utah.[53]  In Utah, "[t]he elements of a breach of contract claim are '(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'"[54]

It is undisputed that Plaintiff and Defendant are parties to a contract—the Policy.  It is also undisputed that Plaintiff suffered damages.  Further, Defendant appears to concede for

---

[52]Docket No. 30 Ex. 1, at 1.

[53]*MediaNews Grp., Inc. v. McCarthey*, 494 F.3d 1254, 1260 (10th Cir. 2007) (citing *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003)).

[54]*MBNA Am. Bank, N.A. v. Goodman*, 140 P.3d 589, 591 (Utah Ct. App. 2006) (quoting *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001)).

purposes of this Motion that Plaintiff performed under the contract.[55]  Thus, at issue in this

Motion is whether Defendant breached its duties under the Policy.

Defendant argues that it did not breach its duties because there is no coverage for the

losses at issue under the unambiguous terms of the Policy and there is no evidence to dispute the

final finding by Mr. Ninyo that all three losses claimed by Plaintiff were caused by the faulty

design of the headworks excavation.  Plaintiff contends that Defendant's interpretation of

coverage is inconsistent with the Policy and, even if the language of the faulty design exclusion

applies, summary judgment is inappropriate because genuine issues of material fact exist as to

the cause of the sheet pile failure, slab settlement, and formation of voids.

In Utah, "[a]n insurance policy is merely a contract between the insured and the insurer

and is construed pursuant to the same rules applied to ordinary contracts."[56]  "'Structurally, a . . .

policy begins with a broad grant of coverage, which is then limited in scope by exclusions.

Exceptions to exclusions narrow the scope of the exclusion, and, as a consequence, add back

coverage.'"[57]  "[A]n insurer may include in a policy any number or kind of exceptions and

limitations to which an insured will agree unless contrary to statute or public policy."[58]  Such

---

[55]*See* Docket No. 39, at 3 n.1.

[56]*Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993) (citing *Bergera v. Ideal Nat'l Life Ins. Co.*, 524 P.2d 599, 600 (Utah 1974); *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 582 (Utah Ct. App. 1990)).

[57]*Am. First Credit Union v. Kier Constr. Corp.*, --- P.3d ----, 2013 WL 5753795, at *2 (Utah Ct. App. Oct. 24, 2013) (quoting *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (10th Cir. 2011)).

[58]*Farmers Ins. Exch. v. Call*, 712 P.2d 231, 233 (Utah 1985).

exclusions from coverage must use "language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided."[59]

In the instant case, the parties contest the proper interpretation and application of the Policy's coverage endorsements, exclusions, and exceptions.  That being said, the Court need not reach the parties' contractual interpretation arguments at this juncture, as under either interpretation Plaintiff's breach of contract claim turns on the same factual issue.  Plaintiff's breach of contract claim turns on the issue of whether the sheet pile failure resulted from the faulty or inadequate design of the sheet-pile wall or from unknown site conditions in the form of excessive subsurface flow.

Defendant has provided multiple expert reports in support of its assertion that all three of the losses at issue were either caused by the faulty design of the sheet-pile wall or were defects that were predictable at the outset of construction.  Plaintiff, however, has provided expert evidence in support of its assertion that the sheet pile failure was caused by unknown site conditions.  It is true that Plaintiff's expert evidence is somewhat self-serving, as it comes from the same entity that performed the original sheet-pile design.  Nevertheless, the report also finds support in the factual background of the case.  It is undisputed that an irrigation pipe, set to facilitate percolating water, was found at the site at the outset of construction.  Further, an artesian condition formed in the excavation prior to the failure of the sheet-pile wall.  Taking

---

[59] *Wagner v. Farmers Ins. Exch.*, 786 P.2d 763, 765 (Utah Ct. App. 1990).

these facts together, there is support for Plaintiff's position that the sheet pile failure was caused by unknown site conditions rather than by an inadequate or faulty design.

Defendant also argues that, even if a factual dispute exists as to the cause of the failure of the sheet-pile wall, summary judgment is appropriate on Plaintiff's slab settlement and void claims. Defendant asserts that such is the case because Plaintiff's expert report came prior to the slab settlement and void claims and Plaintiff has provided no evidence to rebut its expert reports as to the cause of those claims. Defendant's argument is belied by its position on the cause of Plaintiff's losses. Defendant's stated position as to the cause of the slab settlement and void claims, as supported by Mr. Ninyo's report, is that each "is attributable, directly or indirectly, to the inadequate design of the sheet pile shoring system."[60] Thus, under Defendant's own statement of the case, the slab settlement and void losses were part of the same occurrence and attributable to the failure of the sheet-pile wall. Because the Court finds that there are disputed issues of fact as to the cause of the sheet pile failure, it follows that summary judgment is inappropriate on the slab settlement and void claims as well.

At this stage of the proceeding, the Court must construe all facts and reasonable inferences in the light most favorable to Plaintiff as the nonmoving party. Viewing the facts and inferences in the light most favorable to Plaintiff, the Court finds that a triable issue of fact exists as to the cause of the sheet-pile wall failure and, in turn, the cause of the slab settlement and the formation of the voids. For this reason, the Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's breach of contract claim.

---

[60]Docket No. 39, at 32 (internal quotation marks and citation omitted).

D.    BAD FAITH

Defendant next moves for summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing.  "Under Utah law, 'an implied covenant of good faith and fair dealing generally inheres in all contractual relationships.'"[61]  "Pursuant to the covenant, 'each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract.'"[62]

It is settled law that an insurer "cannot be held to have breached the covenant of good faith 'on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied.'"[63]  This is true "whether the debate concerns a matter of fact or law."[64]

> When making the determination of whether a claim is fairly debatable, a judge should remain mindful of an insurer's implied duties to diligently investigate claims, evaluate claims fairly, and act reasonably and promptly in settling or denying claims.  Only when "there is a legitimate factual issue as to the validity of the insured's claim," such that reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care, should the court grant judgment as a matter of law.[65]

------

[61]*Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 533 (Utah 2002) (quoting *Rawson v. Conover*, 20 P.3d 876, 885 (Utah 2001)).

[62]*Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1178 (10th Cir. 2000) (quoting *Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998)).

[63]*Jones v. Farmers Ins. Exch.*, 286 P.3d 301, 304 (Utah 2012) (quoting *Billings ex rel. Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996)).

[64]*Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah 1987) (quoting *McLaughlin v. Ala. Farm Bureau Mut. Cas. Ins. Co.*, 437 So. 2d 86, 90 (Ala. 1983)).

[65]*Jones*, 268 P.3d at 305 (quoting *Prince*, 56 P.3d at 535).

Here, it is undisputed that Defendant promptly instigated an investigation into Plaintiff's claims.  Defendant opened a claim file as to each of Plaintiff's claims soon after receiving notice of the loss.  Defendant promptly assigned a claims adjuster to review each of the claims.  That claims adjustor hired outside consulting firms to review the documentation in support of Plaintiff's alleged losses.  Defendant's claims adjustor also hired an expert consulting firm to determine the cause of Plaintiff's loss.  Defendant's experts each prepared reports with detailed and well supported recommendations regarding Plaintiff's claims.  Defendant appears to have acted at all times in accordance with the recommendations of the expert consultants with which it contracted.  The Utah Supreme Court has held that such "expert[] report[s] create a legitimate factual question regarding the validity of an insured's claim for benefits, making the insured's claim at least fairly debatable."[66]

Plaintiff takes issue with the duration of time that expired between the notice of loss for the sheet-pile wall failure and Defendant's final coverage determination.  It is undisputed that Plaintiff provided Defendant notice of its first loss on or about February 24, 2009.  Defendant did not provide its initial coverage determination until May 3, 2010.  Thus, more than a year transpired between Plaintiff's notice of loss and Defendant's coverage determination.  Plaintiff fails to recognize, however, that during the intervening period of time it made multiple other claims of loss on the same policy.  The latest of these claims was not made until February 3, 2010, only three months before Defendant's coverage determination.  In light of the

---

[66]*Prince*, 56 P.3d at 535 (citing *Callioux*, 745 P.2d at 842).

interconnected nature of Plaintiff's claims, the Court finds that Defendant acted properly in reviewing Plaintiff's claims.

Further, Plaintiff relies on the declaration of its General Manager, Mr. Wood, for the assertion that Defendant improperly represented that the parties had "settled" certain claims and that there would be "substantial coverage."[67]   Mr. Wood's self-serving statements are not supported by the record in this case.  It is undisputed that Defendant commenced its investigation of Plaintiff's claims under a reservation of rights.  The documentation exchanged during the investigation of Plaintiff's claims contains further references to this reservation of rights.  Indeed, the document cited by Plaintiff in support of its claim that certain amounts had been settled explicitly states that "[t]he Insured has been fully aware that the claim was being investigated and evaluated under a Reservation of Rights.  Specifically, the Insured has been reminded in all meetings that there is a possibility the claim may not be covered due to the policy exclusion for faulty design."[68]

In addition, Defendant's denial of coverage turned on the conclusion of its expert that the sheet-pile wall failure was caused by the faulty or inadequate design of the sheet-pile wall by Plaintiff's subcontractor.  When Plaintiff objected to Defendant's coverage analysis, Defendant took steps to investigate Plaintiff's claimed cause of loss.  Defendant proposed a third-party review of the expert reports relied upon by the parties.  Plaintiff agreed to this process.

---

[67] *See* Docket No. 30 Ex. 1, at 2–5.

[68] *Id.* Ex. 18, at 883.

As part of its bad faith claim, Plaintiff now takes issue with Defendant's selection of Mr. Ninyo as the expert for the independent peer review and with the process of the review generally. Plaintiff does not dispute that it agreed to the selection of Mr. Ninyo as the reviewer.  Rather, Plaintiff takes issue with the fact that Defendant engaged in ex parte communications with Mr. Ninyo and received Mr. Ninyo's reports in advance of Plaintiff.  Plaintiff's objections to the independent nature of Mr. Ninyo's work are not supported by the record.

In an email sent by Plaintiff's counsel, Steven Shapiro, Plaintiff confirmed in advance of the selection of Mr. Ninyo its understanding of how the third-party review process would proceed.  In that email, Mr. Shapiro indicated that

> ex parte communications by and with the reviewer is [sic] permitted; no confidentiality will apply to, and all parties will have full access to, the peer reviewer, the reviewer's file, and that reviewer's report; conflict disclosures will be promptly made by the peer review candidates; claims will be tolled during the pendency of the peer review process; and ACE will pay for the peer review process.  As discussed today, I understand that the foregoing is agreeable . . . .[69]

Thus, Plaintiff agreed that either party could engage in ex parte communications with Mr. Ninyo. Further, it was an explicit term of the peer review that Defendant would be the party to contract with Mr. Ninyo and compensate him for his work.  In light of Plaintiff's understanding in advance that either party could engage in ex parte communications with Mr. Ninyo, the Court finds Plaintiff's arguments on this point unconvincing.

---

[69]Docket No. 39 Ex. 2 app. F, at 2.

In sum, the Court finds that the undisputed facts and the record taken together demonstrate that Plaintiff's claimed losses were fairly debatable at the time they were denied.[70] Accordingly, the Court finds that Plaintiff's claim for breach of the covenant of good faith and fair dealing fails as a matter of law.

IV.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Plaintiff's Motion for Leave to File Surreply in Opposition to Defendant's Motion for Summary Judgment (Docket No. 44) is GRANTED.  It is further

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 27) is GRANTED IN PART AND DENIED IN PART.

DATED   February 6, 2014.

BY THE COURT:

_____

TED STEWART
United States District Judge

---

[70]*See Jones*, 286 P.3d at 303 (holding that "[w]hether an insured's claim is fairly debatable under a given set of facts is . . . a question of law" (internal quotation marks and citation omitted)).